Mr. Justice Story,
 

 delivered the opinion of the
 
 *139
 
 Court. This case combs up from the Circuit Court of Kentucky, upon a division of opinion of the Judges upon certain questions stated in the record.
 

 It appears from the record, that the defendant, on the 3d of July, 1801, entered into certain articles of agreement with the Secretary at War, for supplying the troops of the United States with provisions, at certain places enumerated in the contract. Among other things, the articles provide, that the contractor should receive, “ for every complete ration issued at the Chickasaw Bluffs, at Nashville, at Bear Creek, on the Tennessee, or at any place on the road between Nashville and Bear Creek, fourteen cents and, “ for every complete ration issued at any place in the Chickasaw or Choektaw country, on the road between Bear Creek and Natchez,
 
 eighteen cents and one half
 
 centand that, “ should any rations be required at any places or within any other Districts not specified in this contract, the price of the same shall be hereafter agreed on betwixt the public and the contractor.”
 

 At the time the contract was entered into, the road from Nashville to Natchez crossed the Tennessee river
 
 at the mouth of Bear
 
 Creek, which empties into Tennessee river on the southwest side. After the date of the contract, a new road from Nashville to Natchez, passing through the Chickasaw7 and Choektaw country, was cut by the United States troops, which crossed the Tennessee river about twelve or fourteen miles above the month of Bear Creek, and about ten miles further imm Nashville. During the continuance of the contract, a
 
 *140
 
 cantonment, was established on the southwest side of the river Tennessee, at the crossing point of the new road, and in the Chickasaw county. At this cantonment certain rations were issued by the defendant, for which he claimed the contract price of eighteen and a half cents a ration, as rations issued in the
 
 Chickasaw
 
 country. This. claim was disallowed by the Treasury Department, and constitutes the first and second items of an account presented to the Treasury, and referred to in the first question as the paper marked C. The remaining item of the same account, which was disallowed by the Treasury, was for certain rations deposited at Fort Deposit, for which the defendant claimed, also, the contract price of eighteen and a half cents a ration, as rations issued in the Chocktaw country. At the time the contract was made, Fort Deposit was considered within the Chocktaw boundary; but at the treaty afterwards held at Fort Adams, it was discovered, that an .old boundary line existed between the French and the Chocktaws, which was the line adopted by that treaty, and excluded Fort Deposit from the Chocktaw country. There is another account annexed to the record marked D., consisting of certain claims of the defendant against the United States, which were presented to and disallowed by the Treasury Department. Upon these claims it is unnecessary to say more, than that this Court entirely concurs in the opinion of the Treasury Department.
 

 Construction of the contract.
 

 The first question, then, is, whether the defendant is entitled to any or all of the items disallowed by
 
 *141
 
 the Treasury Department in the account C. It is contended on behalf of the United States, that the two first items for rations issued and deposited at the cantonment on the
 
 new road
 
 on Bear Creek, were within that part of the contract providing for rations issued “ at any place on the road between Nashville and Bear Creek,” for which the defendant was entitled to the contract price of fourteen cents only ; and that this sum had been allowed therefor at the Treasury. On the other hand, the defendant’s counsel pretends, as has been already stated, that this cantonment was within the Chickasaw country, and that the phrase, “ Bear Creek on the Tennessee,” in the contract, means the mouth of Bear Creek, on the Tennessee; so that the defendant is entitled to the contract price of eighteen and a half cents.
 

 We are, however, of opinion, on this point, that the contract must necessarily be presumed to refer -to the actual state of things at the time of its inception, inasmuch as there is nothing in it which «hows that the parties had in contemplation any prospective changes. The phrase,
 
 11
 
 Bear Creek, on the Tennessee,” seems to be an unusual description of the junction of a creek with a river ; but in its connection with the context, we are unable to give it any other rational interpretation. And if this were even doubtful, we are of opinion, that the road between Nashville and Bear Creek, spoken of in the contract, is the road then in existence and use between those places, and cannot, in the absence of all evidence of intention, be construed to mean a new road not then laid out or made, nor shown to be in
 
 *142
 
 the contemplation of the parties- The rations then issued and deposited at the cantonment on the new road, were not provided for in the contract at a specific price; not at the price of fourteen cents, for they were not issued at any place on the old road between Nashville and Bear Creek, described in the contract; and not the price of eighteen and a half cents, for it was not sufficient that the cantonment should be in the Chickasaw and Chocktaw country, but it must also be on the road between Bear Creek and Natchez existing at the time of the contract. The case, then, falls precisely within that clause of the articles of agreement, that provides, that the price of rations delivered at any other places not specified, shall be thereafter agreed on betwixt the public and the contractor ; and this is the construction originally adopted by the Government itself.
 

 The same reasons which lead us to this conclusion, constrain us to adopt the construction, that the parties, in their contract, in referring to the Chickasaw and Chocktaw country, intended not a disputed, imaginary, or rightful boundary afterwards to be settled ; but the actual reputed boundary of that country. If, then, .Fort Deposit was within the reputed boundary at the time of the contract, the line as afterwards settled by the treaty at Fort Adams, though the true line, has nothing to do with the case; and the rations deposited at Fort Deposit are to be paid for at the contract price of eighteen and a half cents a ration.
 

 The second and third questions propounded by the Circuit Court, may be shortlv answered. If
 
 *143
 
 there be. no specific price agreed uppn in the contract for rations issued at any place, the contract leaves the price to .be adjusted by the Government and the contractor. It is-to be the joint act of both parties, and not the exclusive act of either. If they cannot agree, then a reasonable compensation is to be allowed ; and that reasonable compensation is to be proved by competent evidence, and settled by a jury¿ as in common cases ; and the defendant upon sueh a trial, is at liberty to show, that the sum allowed him by the Secretary of War is not a reasonable compensation.
 

 Manner in. which the price of rations, issued at places not specified in the contract, is to be settled.
 

 Defendant entitled, under the statute, to any credits against the U. States, whether legal or equitable, or whether arising out of the same or out of distinct transactions.
 

 The fourth question is, whether the defendant can be permitted to. claim a credit for the sums due hint, under the contract, in this suit. The answer may materially depend upon the true construction of the act of Congress of the third day of March, 1797, c. 74. providing for the more effectual settlement of accounts between the United States and public receivers. The third section,of that act provides, that upon suits instituted against any person indebted to the United States, judgment shall be rendered at the return term, unless the defendant shall, in open Court, make oath or affirmation,
 
 that he is equitably entitled to credits
 
 which had been previous to the commencement of the suit submitted to the consideration of the accounting officers of the Treasury, and rejected, &c. The fourth section then provides^ that in suits between the United States and individuals,
 
 no claim for a credit
 
 shall be admitted upon trial, but such as shall appear to have been presented to the accounting officers, of the Treasury for their
 
 *144
 
 examination, and by them disallowed in whole or in part, unless it shall be proved to the satisfaction of the Court, that the defendant is at the time, of the jn possession of vouchers not before in his ’ power to procure, and that he was prevented from exhibiting
 
 a claim, for such credit
 
 at the Treasury by absence from the Ünited States, or some unavoidable accident. The terms of these sections are very broad and comprehensive. The third section manifestly supposes, that not merely legal but equitable credits ought to be allowed to debtors of the United States by the proper officers of the Treasury; and the fourth section prohibits no claims for any credits, which have been disallowed at the Treasury, from being given in evidence by the defendant at the trial. There being no limitation as to the nature and origin of the claim for a credit which may be set up in the suit, we think it a reasonable construction of the act, that it intended to allow the defendant the full benefit at the trial of any credit, whether arising out of the particular transaction for which he was sued, or out of any distinct and independent transaction, which would constitute a legal or equitable set-off, in whole or in part, of the debt sued for by the United States. The object of the act seems to be to liquidate and adjust all accounts between the parties, and to require a judgment for such sum only, as the defendant in equity and justice should be proved to owe to the United States. If this be the true construction of the act, which we do not doubt, the defendant might well claim a credit in this suit for the sums due him, even if they had
 
 *145
 
 grown out of distinct and independent transactions, for he is legally, as well as equitably, entitled to them. But even if this construction of the act were doubtful, upon the facts of this particular case, as far as we can gather them, we should have probably come to the same result.
 

 This suit seems to have been brought by the United States for the money price of certain provisions received by the defendant under the articles of agreement. The real object of the suit is, therefore, to procure an account and settlement of that claim. It forms an item in the general account between the parties, like every other advance made by the Government to the defendant; and, independent of any. statute provision, the defendant would have a right to show, that he had accounted for the value of such advance by delivering the equivalent provisions for which it was originally made; In this view, also, the fourth question might be answered in the affirmative.
 

 The opinion of the Court will be certified accordingly to the Circuit Court of Kentucky:
 

 1. That under the contract marked B., the defendant is not entitled to the sums disallowed in the paper D., nor to the sums specifically charged in the first ánd second items of the paper C., which were disallowed by the Treasury officers ; but is entitled to the sum charged in the third item of the paper C., which was disallowed by the same officers, if Fort Deposit was within the reputéd boundary of the Chocktaw country.
 

 
 *146
 

 2.
 
 That the defendant is not entitled to the. first and second items in the paper C., on the ground, that the place at which the rations were delivered is not specially provided for in the contract; but- that he has a right to show, that the sum allowed by the Secretary of War for those rations, is not a. reasonable compensation.
 

 3. That upon such proof the defendant is entitled to a reasonable compensation for those rations, to be ascertained by the jury.
 

 4. That the defendant ought to be permitted to claim a credit for the above sums due him in this suit.
 

 Certificate accordingly.