Mr. Justice Wheelee,
after having stated the facts of the- *599 case as they are recited in the commencement of this report, delivered the opinion of the court.
A preliminary objection is now urged to the authority of the district court sitting in Harris county to entertain jurisdiction of this case. This objection is based upon the absence of anything in the record to show that the court in Galveston acted rightly in awarding a change of venue.
The objection, in effect, assumes that this court will reverse the judgment of the district court, unless it affirmatively appear that that court did not err; whereas, to authorize a reversal, it must appear affirmatively that the court did err in its proceedings and judgment.
By the statute in force at the date of these proceedings, it was made the duty of the judge to change the venue in any case in which he might be interested upon the motion of any practicing attorney. 7 Stat. 36. The proceedings of the court in Galveston touching the change of venue are not embraced in the record before us, which purports to contain only a transcript of the proceedings in Harris, not of those had in Galveston county. We are not informed, therefore, as to the grounds and merits of the application, or the course of proceeding in which the change of venue was awarded.
But we are required to indulge every reasonable presumption in favor of the action taken by the district court, it being a court not of a limited and special, but of general jurisdiction, and whose proceedings, therefore, must be taken to have been in all- things legal and correct. We must presume, the contrary not appearing, that a case was presented to the court sitting in Galveston which came within the provisions of the statute, and made it legal and proper for the court to award the change of venue in question.
The appellants had been served with process and had answered to the action before the change of venue was awarded. They must be presumed to have been in court and cognizant of the action taken in the case, and if aggrieved by it, it was incumbent on them as vigilant suitors to have contested it at the time. 4 Bibb, 397. It was competent for them to have embodied in the record all the proceedings, together with *600 tlieir exceptions, and if in those proceedings there was any illegality or error, for which they would reverse the judgment, it was incumbent on them to bring before us the record of those proceedings for revision; otherwise we cannot undertake to say there was error. That would be to reverse the rule which requires ns to indulge every presumption in favor of the judgment. Instead of requiring the appellant to bring up the record, and to indicate, and, in the language of a learned court, “ to put his finger on the error,” before the appellate court will reverse the judgment, it would be to reverse the judgment because the party, whose duty it was, had failed to bring up the record, and because, therefore, it did not appear whether there was or was not error in the judgment sought to be reversed. Every presumption is with the judgment, and the party who would reverse it takes upon himself the burden of showing that error has been committed, and in what it consists. This can be done only by bringing before the appellate court a transcript of the record of the proceedings in which the error is alleged to have been committed, properly authenticated and certified for revision. That the “transcript of the record” from Galveston, mentioned as having been produced to the court in Harris, is not before us, is not the fault of the appellee, and that we cannot revise proceedings not before us, is sufficiently apparent.
It appears that the court sitting in Harris county ordered the case to be placed upon its docket upon the production of the original papers in the cause, and “ a certified transcript of the record appertaining thereto, containing the order of transfer ” from Galveston.
This action of the court in placing the case on the docket in Harris county was manifestly correct. The court in Galveston had authority to award a change of venue. This authority it had exercised, and its action in the exercise of its appropriate jurisdiction was not subject to revision by the court sitting in Harris county, but only by the appellate court. That court had no appellate jurisdiction or supervisory authority respecting the proceedings of the court sitting in Galveston. The judge had no authority to look behind the order awarding *601 the change of venue to the evidence upon which it was founded, to entertain the question already adjudicated by a tribunal of co-ordinate jurisdiction, or to permit the action of that tribunal, within its jurisdiction, to be in any manner drawn in question. It was enough that he was judicially informed of the order of the court in Galveston awarding the change of venue.
Moreover, it is not pretended that the defendants, at the time, were not in fact cognizant of the order changing the venue. Nor does it appear that objection was made to the change of venue, in the court below, in either county. After the cause had been entered upon the docket in Harris county, and after one unsuccessful application for a continuance, the defendants, it is true, moved the court “ to rescind the order placing the case on the docket for trial at this term.” But there was no-application to have the cause returned to Galveston, and no resistance or objection to the change of venue in itself, but only to the trial at that term. Had the defendants been prevented or deprived of the opportunity of contesting the order in the court in Galveston, without any fault of their own, then undoubtedly upon showing this they might have urged their objections in the county of Harris, for in that case the matters submitted to the judgment of the latter court would not have been presented to or adjudicated by the former. This, however, was not done. And it has been held that where after a change of venue the defendant goes to trial, or pleads to the action in the latter court without having objected to the change of venue, his objections cannot afterwards be heard. 4 How. (Miss.) 90; 5 Blackf. 21. And where the proceedings appeared to have been commenced in one county and the trial was had in- anothe", the record not showing a change of venue, nor that objection was made to the jurisdiction of the latter court, it was held that a change of venue would be presumed. 6 Blackf. 529..
The case having been entered upon the docket of the court in Harris county, and, as appears, rightly, the only questions arising upon the record before us, and presented for our consideration, relate to the rulings of that court.
*602 1st. In refusing the several applications for a continuance on behalf of the defendants.
2d. In refusing instructions asked by the defendants.
1. If we regard the discretion of the court in deciding upon an application for a continuance as a legal discretion, subject to revision, it can only be in those cases which admit of the application of certain prescribed rules to regulate and control that discretion. But where there is no known rule of law or practice applicable to the case by which the right of the party may be determined, the discretion of the judge can have no other limit or control than his own moral sense of justice, and, in the nature of the case, cannot be the subject of revision. Whether the discretion of the court, thus exercised, is properly the subject of revision in any case, is a question upon which there has been in different courts a diversity of decisions and practice, and one which it is not necessary for this court at present to determine. If the right to revise be admitted, it can be exercised only when, in refusing a continuance, there has been a departure from some prescribed rule, or a manifest abuse of judicial discretion. Has this been the case in the present instance?
After the cause had been entered upon the docket in Harris county, there appear to have been three successive applications for a continuance on the part of the defendants. These were applications for a second continuance by the same party, the cause having been continued on behalf of the defendants at a former term in Galveston, and were severally overruled by the court.
The first was founded on the affidavit of an attorney of the defendants, alleging his inability to attend the court at that term. The affiant was not the attorney of record, yet he does not account for the absence of other counsel whose names appear upon the record as the original counsel in the case. He does not state, as required by the rule, that their absence was “unavoidable,” or negative the supposition that it may have been entirely voluntary and with the consent of the defendants. That the inability of the affiant, whose name did not appear upon the record as counsel, personally to attend the trial, when *603-604 lie was but one of several engaged in the canse, and when the absence of others whose names did appear, was in no way accounted for, was not good cause of continuance, is quite too clear for argument.
The succeeding application was founded on the motion of another attorney of the court “ to rescind the order placing the case on the docket for trial at this term.” This motion can ■only be considered as, in effect, an application for a continuance. It did not deny the authority of the court to docket and take cognizance of the cause, but sought to attach to the order placiug it on the docket a qualification which, in the language of the motion, should “operate a continuance.” In refusing this application we are unable to perceive that any rule of law was violated, or that there was any abuse of judicial discretion calling for a reversal of the judgment. Had it appeared that by being required to proceed to trial at that term, the defendants, without any fault on their part, would be deprived of any just defense, or that their rights would in any manner be jeopardized, a different case would have been presented. But in the mere fact that the case was placed on the docket after the commencement of the term, by a change ■of venue from a court which commenced its session on a day subsequent to the commencement of that to which it was transferred, we see no legal impediment to the trial of the •carrse when regularly reached on the docket of the latter court. When placed on the docket, the case was in general subject to the same disposition in its place and order as any other case. We know of no legal rule or principle which would take this case out of the ordinary rules applicable to other causes. The .motion was addressed to the sound discretion of the court under the circumstances of the case, and it would he difficult ■to indicate any rule or principle of law which has been violated in the exercise of that discretion.
The remaining application founded on the affidavit of one of the defendants, alleging the absence of material witnesses, did not comply with the rule which requires, on a second application, a statement of the facts proposed to be *605 proved by the absent witnesses. It was therefore rightly overruled.
In the refusal of these applications we see nothing to warrant a reversal of the judgment. No one of them was in, conformity to any rule upon the subject. And did we even differ in opinion with the district court as to the proper exercise of its discretion in this instance, it does not therefore follow that the judgment must of course be reversed. To authorize a reversal it must appear that the judge has transcended the law, or the limits of that judicial discretion with which he is invested. 2 Dali. 95; 3 id. 305; 4 Pick. 302; 6 Sm. & Marsh. 451; 1 Ala. 275; 2 id. 320; 4 Cranch, 237; 3-Miss. 123.
2. It remains to consider the several rulings of the court in refusing instructions asked by the defendants.
1. The objection (embraced in an instruction refused) that the plaintiff did not make proof of the appointment of the collector by the production of his commission, we do not think well founded. Neither he nor his sureties upon his official bond were at liberty to controvert his appointment and official-character as recited in their bond. They were estopped to deny that he was collector. 8 Pick. 386; 4 Blackf. 435, 553; 3 Miss. 529; 9 Wend. 209; 2 S. & R. 381; 1 Dana, 527; 5 id. 55; 3 J. J. Marsh. 164; id. 655; 7 id. 192.
2. The court was asked, in effect, and refused to charge, and it is now insisted that the sureties of the collector are not responsible for the value of exchequer bills received by him ine payment of public dues, and withheld from the government,, they having been received by virtue of laws passed subsequent to the date of the bond.
By statutes in force at the date of the bond, 15th of January, 1842, the promissory notes and bonds of the government were made receivable by the collectors of the revenue in payment'of government dues. 1 Stat. 249, sec. 3; 4 Stat. 67, sec. 3. The act of the 19th of January, 1842, passed four days subsequent to the date of the bond, declared that after the 1st day of February thereafter, it should not be lawful for *606 the collectors of customs “ to receive in payment of imposts or duties upon goods, etc., anything except gold or silver, or the exchequer hills authorized to be issued by the provisions of this act.” 6 Stat. 55, sec. 1.
This act, it is insisted, changed the duties of the collector and imposed new duties upon him, and thereby changed the contract and liability of the sureties, and released them from responsibility for his omission or violation of his official duties.
The essential duties of the collector consisted, first, in collecting the dues' in the currency prescribed by law, and when collected, in punctually paying into the treasury, through the proper officer, his collections. And it is not perceived that these substantive duties were in any particular changed or affected by the act in question. The statute merely changed the currency in which the dues were to be received. It did not” undertake to add to, take from, or vary the essential duties attached to the office of collector of customs. It had reference alone to the currency in which he should make his collections.
And in this particular there is no complaint of any departure by him from the line of his official duty. In his collections he strictly adheres to it, receiving, as required by the statute, nothing but gold and silver, or par funds, and exchequer bills. But when he had thus made his collections, there remained another most essential duty to be performed, in no way affected by the statute, that of paying over to the government the moneys so collected. It is the failure to perform this particular duty which is the subject of complaint in this action.
It will not be denied that it was always the duty of the collector, as well before as after the passage of the act in question, to pay into the treasury the specific moneys received by him. This duty existed the same, without modification or change, under all the laws regulating and prescribing his official duties. So careful were the legislature to secure its rigid and exact performance, that they superadded to the collector’s bond the obligation of an oath, to be taken before entering upon the discharge of the duties of his office, espe-ciallv enjoining its performance. 1 Stat. 147, sec. 3; id. 226, *607 see. 3. The authority and duty of the collector, respecting so much of the revenue as was placed by law in his official custody, was a special and limited authority, and consisted simply in x-eceiving and ti-ansmitting to the treasury the specific currency in which the dues were by law made payable. Beyond this his agency and authoi’ity did not extend. He had no right to substitute anything for the identical money received. It was not his money, but that of the government, tempoi-arily confided to his custody and care, solely for safe keeping, until it could be placed in the treasury. It was, when in his hands, in the legal possession of the government, and was no more subject to his control, for any other than this well defined and single object, than is the money in the treasury subject to the conti-ol and disposition of the treasurer for any other than the purposes specified and defined by law. That such was the duty of the collector, respecting his collections, has not been denied, and cannot be doubted. An agent entrusted with funds cannot pay off the debt of his principal and then set off the payment, nor can he convert to one purpose funds deposited for another-, nor can he avail himself of his agency to do for his own benefit that which injures or affects his principal. 1 Rawle, 330; 1 Johns. O. 0. 394; 6 Pick. 204. These principles will not be questioned, and they apply with peculiar force to an agent whose dirties were thus prescribed, defined, limited and enjoined by public law.
It was then the duty of the collector — a duty which admitted of no substitute or equivalent — thus to pay over to the government, whose agent he was for this express purpose, his specific collections. In his failure to perform this duty consisted the breach of his obligation, and that of his sureties, complained of in this case.
That it was a violation of duty for which he is liable is not denied, but it is insisted that his sureties are not liable. Tet this duty was precisely the same when the sureties contracted as when the breach complained of occurred. And it was to insure its performance that the undertaking and responsibility of the sureties was required. The express terms of their contract obliged them to stand amenable for the faith *608 ful performance of the duties of the collector, of which this was one of the principal. Their peril was thus made to depend upon his fidelity by express stipulation, and when that was wanting their liability was fixed and determinate, agreeably to the express terms of their contract, and required them to make reparation to the government, to the extent of their undertaking, for the injury thus occasioned.
That the liability of a surety, as it is insisted, is not to be extended by implication beyond the terms of his contract; that “ his undertaking is to receive a strict interpretation and is not to be extended beyond the fair scope of its terms,” are legal propositions which will not be questioned. 9 Wheat. 680, 720; 10 J. R. 180; 15 Pet. 187; 2 Penn. 27; 4 Shep. 72. And it is conceived to be in exact conformity to these principles that the liability of the sureties has been sought to be •enforced in this instance. They are urged to the fulfillment of no other than their precise contract; and nothing more is asked of them than that they shall perform their undertaking agreeably to its clear and obvious import and its very terms.
But the alleged exemption of the sureties is supposed to arise from the change in the currency, effected by the act before cited of the 19th of January, 1842, upon the supposition that this change imposed new duties upon the collector, and thereby changed the contract and liability of his sureties.
We have seen that the essential duties of the collector, of receiving and pajdng over the dues, was in no respect changed by the statute, but remained the same in whatever currency they were by law made payable. New duties, in the sense in which these terms are employed in the cases cited, were not assigned to the collector or attached to his office by this mere change in the currency. No new duty was created and added to those previously existing, but the change related alone to the manner of performing a pre-existing duty. It merely changed the terms of the instructions which it was the duty of the collector to obey, and to which his sureties when they contracted must be supposed to have tacitly consented the government might give and vary as occasion might re *609 quire, conformably to the authority conferred upon congress by the constitution. The currency in which the government might, from time to time, consent to receive the revenue constituted no part of the contract of the sureties, and the change in question did in no way affect the obligation of that contract. It did in no respect add to or change the official duties of the collector, but merely defined the manner of their performance.
If the collector had received the dues in gold and silver, or ‘‘par funds,” as it was always lawful for him to do (and as in fact he did in part), no one will question that it would have been his duty to have paid into the treasury that specie; and in case of his failure or refusal to do So, his sureties as unquestionably, by the terms and clear import of their undertaking, would have been responsible to the government for the injury thus occasioned. Can it alter the case that he received by permission of the government, expressed in the act in question, a part of the amount which he thus failed to pay into the treasury in exchequer bills? It was equally his duty to-pay over these bills, and this duty was precisely the same in the one case as in the other. There was nothing surely in the-contract with the sureties which obliged the government to collect its dues in any particular currency. They incurred no greater peril when the collector received exchequer bills than when he received gold and silver.
The power to raise a revenue for the support of the government was vested in congress by the constitution. Art. 2, secs. 1, 2, 7. The manner of its exercise was of course subject to legislative control and regulation from time to time,, as might be found expedient. The collector and his sureties-must be supposed to have contracted in reference to existing laws, and with the implied consent that congress should exercise this power, conferred upon it by the paramount law, and so essential to the very existence of the government. ¥e cannot suppose that in entering into this contract with the collector and his sureties the government was understood as relinquishing its right to exercise a supervisory control over the subject of the revenue, and to pass any law changing the rate of duties, or the currency in which they were receivable;. *610 or that this contract was designed to operate as a restriction, and limitation upon the power of legislative control and supervision over this subject. The legislature had as undoubted a right to prescribe the currency in which the dues should be paid, as the amount of duties on importations, and the exercise of the one right, no more than the other, could affect the liability of sureties on bonds conditioned for the faithful performance of the official duties of the collectors of customs.
The cases cited by the appellants in support of their view of this question are recognized as containing a correct application of legal principles to the facts of those cases, but they are so manifestly inapplicable to the present case as not to require comment.
3d. Again, the court was asked, and refused to instruct the jury, that the promissory notes and bonds of the republic constituted the subject of a legal set-off in this action.
In support of this proposition, we are referred to several decisions by the courts of the United States, in which it has been held that “ when a defendant has in his own right an equitable claim against the government, for services rendered or otherwise, and has presented it to the proper accounting officer of the government, who has refused to allow it, he may set up the claim as a credit in any suit brought against him for any balance of money claimed to be due by the government,” etc. 9 Pet. 319. By reference to these cases, it will be seen that they all refer the origin of the right to the act of congress of the 3d of March, 1797, ch. 64. 1 Story’s Laws, 464. And whenever a set-off has been allowed against the United States, it seems to have been based solely upon the authority of that statute. This will appear by consulting the following cases: U. S. v. Wilkins, 6 Wheat. 135, 143; U. S. v. Fillebrown, 7 Pet. 384; U. S. v. The Bank of the Metropolis, 15 id. 377; U. S. v. Giles et al. 9 Cranch, 212.
The language of the court in the case cited from 2 Brock. 1, does indeed seem to favor the doctrine contended for, viz.: that this right of set-off against the government existed before, and independent of, the provisions of the act of congress of 1797. That case, however, was decided expressly upon the authority *611 of the case of The United States v. Wilkins, just cited, and .this question of the existence of the right, independent of the statute, was not raised by the facts of the case, and cannot be said to have been decided by it.
If, indeed, the proposition contended for was the law, it is remarkable that not one adjudicated case can be found in which it was ever recognized, or in which the right of set-off here claimed was ever allowed against the United States previous to the statute, and that all those since determined refer to it as constituting the foundation of the right in question.
Besides, this doctrine cannot be reconciled with the language of the supreme court in repeated decisions, in which the right of set-off against the United States is treated, not as a pre-existing right recognized by the statute, but as a right originally given by it.
In the case of The United States v. The Bank of the Metropolis, 15 Pet. 377, the court say of this right of set-off against the government, that it “ is the privilege of a defendant for all equitable credits, given by the act of March 3, 1797.” Id. 392. And again, “ this right was early given by an act of congress to all defendants in suits brought by the United States.” Id. 403; id. 470 ; 6 Wheat. 143, 147 ; 9 Pet. 323. If, then, this right was “ given by an act of cougress,” it is manifest that it did not exist before it was so given, and that the statute did not merely recognize a pre-existing right, but gave one, which without it could not have been maintained by a defendant. We have no such statute conferring upon the courts jurisdiction over this subject, and hence no permission or consent of the government, express or implied, on which to rest the right in question.
The government “ is not subject to those coercive measures which may be employed against an individual.” 2 Brock. 10. It can be sued only with its own consent, and in the manner and for the causes which it may by law prescribe. But it would be of no avail to the government that it cannot be coerced by a direct suit, if the same thing may be done indirectly in another manner. Coercion in either mode is incompatible with sovereignty. Whether it be directly by suit,, or *612 indirectly by set-off, which is in the nature of a cross action, is immaterial. There is no difference in principle, the only difference is in mere forms; and. the principle and policy which forbid a direct suit against the government would be as effectually violated and defeated by according to the defendants the right here claimed.
When individuals have rights against the government, the clearest principles of equity and justice demand that those rights shall be respected, and the theory of the law is that this will be done by the government.
But however clear the right may be, and with whatever force of reason, equity and justice it may address itself to the moral sense of right, it can be enforced against the government only by its consent, and in the manner it may prescribe.
But we are not left to deduce the rule of our decision in this case from the general principles of the law upon this subject, however satisfactory they may appear. The exact question has been decided by a court whose opinions are entitled to very high consideration. In the case of The Commonwealth v. Matlack, 4 Dall. 303, the supreme court of Pennsylvania decided that a debtor to the state when sued by it “could not indirectly recover from the state a substantive independent claim by way of set-off, any more than he could directly recover a debt due from the state by bringing a suit against her.”
And the principle of this case was recognized by the supreme court of the United States in the case of The United States v. Giles, 9 Cranch, 228. In that case the counsel for the United States maintained that “A defendant cannot set off a debt if he could not maintain a suit for it.” Citing the above case of The Commonwealth v. Matlack. “ This defendant,” they proceeded to say, “ could not maintain a suit against the United States.” “ The court,” says the reporter, “ stopped the counsel for the United States upon this point, saying they were satisfied.”
These cases must, we think, be regarded as affording sufficient authority on which to rest the decision of this question, *613 even if the principle they assert did not appear in itself so manifestly correct.
4. The court was further requested to instruct the jury that the promissory notes and bonds of the government were, under the pleadings, a legal tender.
By the constitution, art. 2, sec. 2, nothing but gold and silver could be made a lawful tender. Uo statute, therefore, could have the effect to malee these notes and bonds a “ lawful tender.” The government undoubtedly had at all times the right to require the payment of its dues in constitutional currency. This right, however,, it could waive; and by the statutes before cited, by which it was enacted that these notes and bonds should be “ received as cash for all dues owing or coming to the government,” it had waived this right and consented to receive the dues .in these notes and bonds. But this consent the government had the undoubted right also to withdraw, and did withdraw before the collector acted in the matters in question, and long before the defendants sought to avail themselves of it by the repeal of the laws authorizing the receipt of these notes and bonds, effected by the act of. the 19th of January, 1842, providing for the issue of exchequer bills. If these notes and bonds had been tendered to the collector by an importer in payment of the duties on his importations before the repeal of those enactments, it cannot be doubted that they would have been tendered in payment of “dues owing or coming to the government” within the intendment of the statutes, and they must have been received by the collector, whose duty it was to obey the laws under which he exercised the functions of his office. But they were not so tendered. They were not offered to the collector in payment of duties; nor were they tendered by the sureties in discharge of their liability until long after the repeal of the laws conferring that right. And the same reasons which forbid the enforcement of a claim against the government by direct suit, or indirectly by set-off, must also apply equally to the claim here 'set up of the right of tender. The government cannot be coerced in any manner. The repeal of the statutes authorizing the re- *614 -eeipt of these notes and bonds was an express and direct act of refusal by the government thereafter to allow the right now «claimed. And it is manifest that nothing short of a power superior to that of the political department of the govern-ment — a power capable of employing coercive measures against it — can obviate the effect of that refusal and enforce this claim of right without the consent and against the will of the government.,_ That such a power is vested in the judiciary will ■not be pretended.
The liability of the sureties in this case did not arise from acts done by their principal under enactments repealed 'by the act of the 19th of January, but from acts done long subsequent to that repeal. And they cannot now invoke the aid of the dead letter of those repealed enactments to enforce a claim against the government in a manner recognized by no •existing law.
If this defense could avail the defendants in this case, then ■every fiscal agent of the government — every one employed in the collection of the revenue, or through whose hands it is required to pass, or to whose custody and care it is entrusted, may appropriate it to his own use, and he and his sureties ■compel the government to receive in satisfaction some of its • own liabilities; and thus the entire revenue may be consumed by the very agents employed for the purpose of its • collection and safe keeping. It might with just as much legal propriety be urged that the public treasurer may withhold from the government the money in his custody, and he and his sureties discharge their liability to the government by tendering in satisfaction its depreciated paper, as that the present defendants can thus discharge their liability in this case. A -doctrine which would involve such consequences is repugnant to the plainest principles of justice, and to every correct interpretation of the law.
• 5th. Finally, it was asked as an instruction, and is now insisted, that though the facts set forth in the answer do not amount in law to a justification, or constitute a valid defense to the action, yet if-proved as alleged, the issue was main- *615 tamed on the part of the defendants, and they were entitled thereupon to a verdict and judgment in their favor.
This proposition seeks to invoke the aid of a technical rule, of the English pleadings which has no place in' ours. We-have none of the mere formal issues, and hence none of the-rules applicable to them in the English pleadings.
It doubtless is the duty of a party to except and thus obtain-directly the judgment of the court upon the pleadings of' his adversary which he may deem insufficient; but should1 he fail to do so, this will not authorize a judgment upon a. petition or answer which manifestly discloses no cause of action or grounds of defense, though its verity in fact be admitted or proved. The mere omission of the plaintiff to except to an insufficient answer cannot give a right which the-answer does not disclose, nor divest the plaintiff of his right to a judgment, if, upon the whole case, he shall appear entitled to recover. The court cannot give to the allegations of the-answer, when proved, any more than their legal effect.
The answer contained a general traverse and threw upon the-plaintiff the burden of proof.- But the irrelevant and insufficient matters set up as a defense, though proved as alleged, cannot be regarded as giving a right or as being entitled to any legal effect.
When the plaintiff has made out a good case in proof, its legal effect and the rights arising upon it can be repelled and overborne only by the maintenance of a valid legal defense. “ When the foundation of the action has manifestly failed, (said Chancellor Kent, in Palmer v. Lorillard, 16 Johns. 343), we cannot without shocking the common sense of justice allow a recovery to stand.” It would be equally repugnant to the-sense of justice to allow a defense which manifestly disclosed, no legal right in the defendant, to prevail against a valid subsisting cause of action supported by proof.
We think the rulings of the court, in refusing instructions-asked, clearly correct, and sustained by every just application of legal principles to the facts of this case. And upon the whole, we are of opinion that the plaintiff has made out his case by legal and .competent evidence, and that neither thes *616-617 answer nor tbe proofs adduced in its support presented any valid defense or interposed any legal obstacle to the rendition of judgment in his favor.'
But tbe judgment is for an amount, including interest, which exceeds the penalty of the bond. This is error. But the attorney general having entered a remittitur of the excess, such judgment must be now here given as the court below ought to have given.