CASE No. 1159.

STATE OF SOUTH CAROLINA v. CORBIN & STONE.

1.  Under a statute which authorized the attorney-general "to file and prosecute informations or other process against persons who intrude upon the lands, rights or property of the State," he had authority to institute an action to recover moneys of the State received by attorneys representing a former attorney-general in a previous action brought by such former attorney-general to require a corporation to pay for phosphatic rocks taken from lands belonging to the State.

2. This action was also authorized under Chapter XVI., ₰ 35, of the General Statutes, which requires the attorney-general "to defend the rights of the State in all cases wherein the rights of the State may be involved."

3. It having been twice reported to the General Assembly by two successive attorney-generals that this action had been instituted and was pending, and no disapproval having been expressed by that body, it amounted to a confirmation by the General Assembly of the action taken.

4. There is no statute that authorizes the comptroller-general to settle with attorneys representing the State for moneys of the State in their hands by allowing them to retain a part in payment of fees for services rendered by them in recovering such moneys.

5. Such a settlement would be in violation of Article II., ₰ 22, of the constitution, which provides that "no money shall be drawn from the treasury but in pursuance of an appropriation made by law."

6. In this action the Circuit judge construed the order of the court in a former cause allowing attorneys a certain *per centum* of the fund collected, and submitted it to the jury to say what was the amount of the fund then collected. *Held,* that in this there was no error.

7. An order of a Circuit judge allowing attorneys a certain *per centum* of moneys recovered for the State as a fee for services rendered in the cause, could amount to no more than an audit of the proper fee, as the moneys of the State can be paid out only in pursuance of an appropriation made by law.

8. An individual has no right to sue the State directly, nor can he interpose a claim against the State as a counter-claim, discount, or set-off in action brought against him by the State.

9. To a counter-claim in such case, an oral demurrer interposed at the trial was properly sustained.

10. The United States Circuit Courts have no jurisdiction of a controversy between a State and a citizen of another State. It was not error, therefore, in the State court in such case, to refuse an order removing the cause to the United States Circuit Court.

11. Irrelevant and immaterial remarks of the Circuit judge to the jury on the facts, furnish no ground for a new trial.

---

Before HUDSON, J., Richland, July, 1880.

This was an action by the State of South Carolina against D. T. Corbin and William Stone, partners in the practice of law. The opinion fully states the case.

*Mr. W. E. Earle,* for appellant.

*Messrs. Youmans,* attorney-general, and *C. R. Miles,* contra.

March 7th, 1882.   The opinion of the court was delivered by

SIMPSON, C. J.   In this case, the State brought action against the defendants for certain money collected by them as attorneys, to wit : for $28,000, less $3,700 allowed them in the complaint as a counsel fee.   The defendants, appellants, interposed objection to the action on the ground that it had been instituted by authority of the comptroller-general, and they denied the right of the comptroller-general to prosecute such action.   This objection was overruled by the presiding judge.   They then claimed that the money sued for had been collected by them in a certain proceeding against the " Oak Point Mines," in which they represented the State ; that the Circuit Court had allowed them sixty-two and a half per cent. upon this amount, and that they were entitled to retain this much at least.   The court left it to the jury to determine whether the whole amount in the hands of defendants had been recovered in that suit, or only a portion, to which the order of the Circuit Court referred.

For a further defense, they relied on an alleged settlement made with T. C. Dunn, the then comptroller-general, in which this matter had been adjudicated, and the balance due, to wit, $206.06, had been turned over to the State treasurer.   They also set up various counter-claims and set-offs for services rendered the State as attorneys.   These, on motion, without previous notice, were struck out, upon the ground that they constituted a cross-action and that the State could not be held to answer thereto.   Among these counter-claims was one for a sum of money alleged to have been advanced to the treasury, which Treasurer Leaphart had taken credit for in accounting with and paying off the members of the General Assembly of 1876 and '77.   The court refused to hear testimony on this subject, it being a counter-claim that could not be set up in the courts against the State.

The defendant Stone claimed to have acquired citizenship in New York before suit brought, and upon a showing that he had instituted proceedings to remove the case to the Circuit Court of the United States, asked judgment of dismissal as to him.   This was refused.   The jury found a verdict for $23,728.44, with

interest from July 8th, 1876. The defendants appealed from the above rulings of the presiding judge, and also from certain refusals to charge upon requests, hereafter to be noticed and considered if necessary.

The important questions in the case are : *First.* Did the settlement made with Comptroller Dunn bar this action ? If not, then, *Second.* Did the presiding judge err in submitting to the jury as a question of fact, whether the whole amount in defendants' hands had been collected in the suit against the Oak Point Mines Company, and therefore subject to the order of the Circuit Court allowing defendants sixty-two and a half per cent. as a fee, or only a part of it ? *Third.* Did the judge err in holding that the State could not be sued even by a counter-claim ?

Before considering these questions, however, it will be proper to dispose of the question which lies at the threshold of the case, as to the authority of the attorney-general to institute this action. In 1873 Attorney-General Melton, under " An act to fix the salary and define the duties of the attorney-general," (*Gen. Stat.* 109, § 26,) which empowers the attorney-general, when in his judgment the interests of the State require it, to file and prosecute proceedings against persons who intrude upon the lands, rights, or property of the State, * * * commenced proceedings against the South Carolina Phosphate Company, Limited, or the " Oak Point Mines," for intruding upon the rights of the State by mining and removing from North Wimbee creek, a navigable stream, phosphate rock, the property of the State, and prayed judgment for the value of the rock removed, and for perpetual injunction. * * * The appellants, with Attorney-General Melton, represented the State. Under an order of court in that proceeding, this company paid to appellants the sum of $28,000. Of this amount they paid to the treasurer in June, 1877, $206.06, retaining the balance as fees for professional services, viz.: $17,737.34 in that case, and $10,056.60 in another. Attorney-General Conner, at the instance of Comptroller-General Hagood, in August, 1877, brought action to recover this money, thus retained by appellants as counsel fees, claiming that appellants under the order of the court, hereafter to be considered, were entitled to retain only the sum of $3,700.

This action, thus commenced by Attorney-General Conner, has been continued by Attorney-General Youmans, and is the one now before the court.

There can be no doubt but that Attorney-General Melton, under Section 5 of the act above referred to (*Gen. Stat.* 110), had authority, on his own motion, to commence the action against the phosphate company, which resulted in the recovery of the money here sued for. This section is as follows: " He may, when in his judgment the interests of the State require it, file and prosecute information or other process against persons who intrude upon the lands, *rights,* or *property* of the State." This gave Attorney-General Melton full authority to act in the original suit, and we think the act is wide enough to vindicate the action of Attorney-General Conner in instituting this suit and Attorney-General Youmans in prosecuting it. This suit may well be regarded as an incident to the action against the phosphate company. It is intended to gather the fruits of that action, and was rendered necessary as a result thereof.

Besides, if the appellants illegally withhold the State's money claimed at their hands, why is not this a violation of the act above cited? Money is *property,* and if appellants are illegally in possession of the State's money and refuse to deliver it, why, in contemplation of law, may they not be regarded as having intruded themselves upon the property of the State and thereby made themselves liable under the act above referred to.

But, in addition to this, the attorney-general is especially required to " defend the rights of the State in all cases where its rights are involved." *Gen. Stat.* 110, § 35. The prosecution of a claim in behalf of the State is defending its rights. In fact, inasmuch as the State is seldom or never a defendant in a cause, the only, or, at least, the general way in which he may be called upon to defend its rights, is by prosecuting its claims as plaintiff. But still, in addition, it appears that Attorney-General Conner reported this action to the General Assembly; the same report was made by Attorney-General Youmans after he took charge of the case. Even then, if legislative authority was required, the failure of the General Assembly to condemn or disapprove, after two formal reports, on the familiar doctrine of principal and

agent, would amount to a confirmation.  This objection cannot be sustained.

Next, was the comptroller-general authorized to make the settlement relied on by the appellants as accord and satisfaction? If the comptroller had such power, it should be found in the acts creating the office and defining its duties.  There are no common law powers attached to this office.  On the contrary, the comptroller is a constitutional officer, having only such powers and duties as have been, or may be, provided by law. *Const.* Art. III. § 23.  We have not been cited to any act in which such power is expressly delegated, nor in which such duties are imposed, as would by necessary implication invest him with such power.  Nor have we been able to find any act of the kind.  We conclude, therefore, that no such act exists.

But, even if one could be found, would it be constitutional? The legislature might authorize the comptroller or any other officer to audit and determine claims against the State, but could it empower such officer to direct payment and satisfaction in the absence of a regular appropriation.  Section 12, Article IX. of the constitution, provides in brief and express terms, "That no money shall be drawn from the treasury but in pursuance of an appropriation made by law."  This section stands directly in the way of the settlement of Comptroller Dunn, as an accord and satisfaction, even if he was authorized to adjudicate the claim of defendants.  The adjudication, even if legal, did not authorize appellants to retain the money in payment of their claim.

No officer of the State is empowered to appropriate the public money in this shorthand way.  The General Assembly makes the appropriation, the comptroller draws his warrant, and the treasurer pays.  This may seem somewhat formal and technical, especially when the creditor has the money already in his hands. But experience has taught that it is best to be particular in reference to public funds.  Some forms must be observed and some checks interposed.  These have been required with us, and no power has been given to any officer to dispense with them.

Next.  Did the Circuit judge err in submitting to the jury the question whether the order of Judge Maher, allowing appellants sixty-two and a half per cent. on the amount collected,

covered the entire amount received, or only that part received under the first judgment? The original action against the phosphate company was brought to recover damages on account of phosphate rock dug previous and up to the date of the action, and for perpetual injunction. This action was instituted in 1873. On July 21st, 1875, a decree was filed in this action, giving judgment to plaintiff for $5,984, being the value of rock mined up to the commencement of the action. At the same time it was further ordered that the company be enjoined from continuing their mining operations until they complied with the act of March, 1870, Section 3. 14 *Stat.* 381. On the same day, a second order was filed directing the referee to ascertain and report the quantity of rock mined by the company pending the litigation, the company having been permitted to mine during the litigation under an arrangement agreed upon. On November 9th, 1875, the referee reported, under this last order, that 22,016 tons had been mined while the suit was pending, in addition to that for which judgment had already been granted. On November 11th, 1875, the court confirmed this report of the referee and ordered the company to pay to plaintiffs' attorneys the sum of $22,016, and also the sum of $5,984 previously adjudged to plaintiffs. In October, nearly a month before this last report in November and its confirmation by the court, the judge, on motion of the appellants, and upon the suggestion of Attorney-General Melton, referred to Asher D. Cohen, Esq., the matter "to determine and report what per cent. of the fund collected in the above entitled cause would be proper compensation to be paid to Messrs. Corbin & Stone for their professional services therein."

It will be observed, that when this order was made, no money had actually been collected, but judgment had been rendered for $5,984, the value of the rock mined up to the commencement of the action, and which was the result of the suit proper. Mr. Cohen, October 28th, 1875, reported, recommending sixty-two and a half per cent. of the fund collected in the case as a suitable fee. This report was confirmed by Judge Maher, November 4th, 1875, all this being before the decree of November 11th, giving judgment for $22,016 for the mining during litigation, and after the judgment for $5,984, the value of the rock mined

up to the beginning of the action. Now, the question before Judge Hudson upon these facts was, did Judge Maher intend to subject both of these amounts to the sixty-two and a half per cent. as appellants' counsel fee, or did he intend to apply this measure to the $5,984 only, which was the product of the suit proper.

In the extract from Judge Hudson's charge found in the exceptions, it does not clearly appear what precise question he submitted to the jury. It is unfortunate that the whole charge has not been furnished. The brief is exceedingly voluminous as to other matters, but it is meagre as to the charge of the judge, and the court has had some difficulty in determining the exact question submitted. It was the province of the court to construe the order of Judge Maher and to submit to the jury such questions of fact as arose thereon, and, as we understand the charge, this is what Judge Hudson did. He construed the order to mean that the counsel fee was to come from the product of the action proper, and he submitted to the jury, as a question of fact, the question, what fund had been collected in that action, stating to them at the same time that the $22,016 was the result, not of the action, but of an intermediate arrangement to prevent suit. We see no error in this. But, even if there was, we do not see that it should affect the result of this case. Admit that it was the purpose of Judge Maher's order to fix the fee at sixty-two and a half per cent. of the whole amount collected ($28,000), could that order, thus interpreted, have been allowed as a defense to this action, brought to recover money in the hands of appellants belonging to the State? We think not. Judge Maher, provided he had jurisdiction of such question, might have settled the amount of the claim due appellants. But would that have authorized Judge Hudson to direct his jury to give appellants credit for that amount in the action before him? This would have been an appropriation of the State's money by the court, when the constitution says that no money can be appropriated except by the General Assembly.

But, did Judge Maher have legal authority to adjudicate appellants' claim against the State? We know of no act or law which gives the courts of the State jurisdiction to audit claims of

this kind. The order of Judge Maher amounted to nothing more than an audit. It simply adjudged the value of the services, fixing sixty-two and a half per cent. of the amount "collected in the suit" as proper compensation. It did not order payment, nor could it have done so legally. And for the same reason Judge Hudson was powerless to have this amount credited on the funds in the hands of appellants. If the order of Judge Maher was final and conclusive as to the amount of the fee, the appellants should have paid the money collected by them into the treasury of the State, and have gone before the legislature with this order and had their claim incorporated in the appropriation bill. Under this view of the case, as the order of Judge Maher could in no event have been a good defense to this action, it is immaterial what question Judge Hudson submitted to the jury arising thereon.

Next, did the judge err in holding that the State could not be sued in her own courts, and on that ground in ruling out the counter-claims of appellants? It is hardly necessary to discuss the question as to the right of an individual to sue the State directly. That no such right exists is universally admitted. However righteous, just and meritorious the claim may be, the courts can afford no remedy. The State in her sovereignty will do justice at her own will, and not by the intervention of her courts. The courts are of her own creation, and for her citizens. *Treasurers* v. *Cleary*, 3 *Rich.* 374; *State* v. *Baldwin*, 14 *S. C.* 138.

But it is said that this is a discount or counter-claim, and not a suit. In *Treasurers* v. *Cleary, supra,* that question was made, and the court said : " A discount is nothing else than a modified form of suit, in which defendant claims of the plaintiff some right which he might enforce in a suit at law." In the *State* v. *Baldwin, supra,* McIver, A. J., for the court, said : " The State cannot be sued in its own courts, nor can the defendant interpose such claim as a discount or set-off, which is nothing but a *cross-action,* to an action against him by the State." He said further, " one who renders service to the State, for which there is no compensation provided by statute, cannot, as in the case of services rendered to a private person, raise an implied *assumpsit* against

the State, and for such services he has no *legal* claim which can be enforced by *process of law.*" The discount allowed in the case of the *State* v. *Gaillard,* 1 *Bay* 500, was especially provided for under the amercement acts—and that case has no general application. The cases referred to by appellants' counsel, from the Supreme Court of the United States, in our opinion are inapplicable. They were all, more or less, influenced by the act of Congress, March 3d, 1797, providing for discounts legal and equitable against the United States, under certain circumstances and conditions. True, in some of the cases it is stated that this act did not create the right to discount, but simply recognized it as pre-existing, and that the act was intended to regulate and control it. But still, in reading the cases we cannot fail to see that the act was relied on as the foundation. Besides, in some of the cases, the claim set up by defendant was for services rendered under contract well defined and the fees fixed by law. In others for a *pro rata* share of funds in possession of the government, in which the defendants claimed an interest, differentiating these cases from the case now under consideration.

Thus, in the case of *United States* v. *Mann,* 2 *Brock. Marsh.* 10, the defendant's claim, as deputy marshal, was founded upon services which his office required him to perform under law, the fees being fixed by statute.

In the case of *United States* v. *Wilkins,* 6 *Wheat.* 144, Judge Story said: "We think it a reasonable construction of the act (referring to the act of 1797) that it intended to allow the defendant the full benefit, at the trial, of any credit, whether arising out of the particular transaction for which he was sued, or out of any distinct and indefinite transaction, which would constitute a legal or equitable set-off of the debt sued for by the United States."

In the case of *The Siren,* 7 *Wall.* 154, where Mr. Justice Field lays down the doctrine more broadly in favor of appellants' position than in the other cases, the proceeding was *in rem,* and the court permitted the claims of individuals to be established against the property libeled, although adverse to the claim of the United States. Justice Field, it is true, placed this right broadly on the ground of set-off, saying that "although direct

suit cannot be maintained against the United States, or against their property, yet, when the United States institute suit, they waive their exemption so far as to allow a presentation by the defendant, of set-off, legal and equitable, to the extent of the property demanded."

But we do not see that this declaration was necessary to the case and the judgment rendered. The Siren had been condemned by the court at the instance of the government, and the proceeds having thus been placed in course of judicial administration, it was held that any proper claim prior to that of the government might well be paid out of such proceeds. We do not see that this prevented a case of discount or set-off. In the case from Kentucky—*The Sinking Fund Commission* v. *Northern Bank*—the State had sold property to the defendant with a mortgage over it. The court allowed the defendant a reduction out of the purchase-money sufficient to remove the encumbrance. The case in 18 *Geo.* 662, *Powers* v. *Central Bank*, is placed squarely on the right of discount, but Judge Lumpkins seems to have reached his conclusion with hesitation and doubt, and frankly suggested at the conclusion of his opinion that it would be well for the State legislature to pass an act similar to the act of Congress, expressly allowing defendants to discount legal and equitable claims against the State. From a note appended to this case, it would seem that it did not give satisfaction.

But, whatever may have been decided elsewhere, in the face of our own cases of the *Treasurers* v. *Cleary* and the *State* v. *Baldwin*, we cannot do otherwise than hold that the claim of appellants had no legal status in the court below. It is universally admitted that a State cannot be sued in its courts without its consent. Our courts have decided that a counter-claim is a suit. It is so recognized in this case by the appellants in their motion for judgment on the failure of the State to answer their counter-claim, and cannot be set up.

There can be no doubt, however, that there is an underlying principle of justice, which might permit defendants, under proper regulations, to have their claims against the State, if any, considered and passed upon by the same tribunal before which they

may be summoned to answer the State.   And, if we might presume to suggest, it may be wise for the General Assembly to enact some remedy in such cases.   Until then we must declare the law as it stands.   Our province is judicial, not legislative.

The defendant, Stone, sought to remove this case, as to himself, into the Circuit Court of the United States for the District of South Carolina, on the ground that at the commencement of the suit he was a citizen of New York.   The petition presented for that purpose and the bond filed were in form correct, but no order was granted by the Circuit Court, Judge Shaw, before whom the motion was made, having died without acting thereon, and the motion was not renewed thereafter.   The attorney for Stone, however, filed a copy of the proceedings in the Circuit Court of the United States.   Thereafter, in 1880, Attorney-General Youmans moved that court to have the case stricken from its docket, but no decision has been rendered on that motion.   Under this state of facts Judge Hudson refused the motion, and ordered the trial to proceed against both defendants. We think he was right.

We do not see that the United States Circuit Court has anywhere been given jurisdiction in a controversy between a State and a citizen of another State on the ground of the citizenship of the parties.   That court has jurisdiction only as has been conferred by the act creating it, and the amendments thereto. We have been pointed to no act conferring such jurisdiction as contended for here.   The constitution of the United States has conferred this jurisdiction upon the *Supreme Court*, but nowhere do we find it conferred upon the Circuit Courts.   The reason seems to be founded in the dignity of the State.   *Respublica* v. *Cobbet*, 3 *Dall.* 467.   In the *Railroad Co.* v. *Mississippi*, 12 *Otto* 136, the case was removed to the Circuit Court, but this was on the ground that the controversy involved the construction of an act of Congress.   It belonged to that class of cases where jurisdiction is conferred, because "arising under the constitution, or the laws of the United States."   It affords no authority for the motion made here.   Besides, it does not appear, except in the statements of the petition, that defendant, Stone, was a citizen of New York when this action began.

The Circuit Court then not having jurisdiction in a case like this, it was not subject to removal, under the acts of Congress providing for the removal of causes to the United States Circuit Courts. *Dillon* p. 10 *et seq.*

· We do not think the court below was in error in admitting the oral demurrer interposed by plaintiff to the counter-claims of defendants. This demurrer raised the question of jurisdiction. This question, under Section 171 of the code, like that, " That the complaint does not state facts sufficient to constitute a cause of action is expressly reserved from waiver, although no objection be taken by formal demurrer or answer." The cases referred to by appellants' counsel, in 12 *S. C.* 56 and 592, do not controvert this proposition. There the objection was such as required a formal demurrer. Neither do the cases of *Bank* v. *Zorn,* 14 *S. C.* 450, and *Cohrs* v. *Fraser* apply ; there the motion was to strike out the answer, not for the want of jurisdiction, but for other causes.

The exceptions involving inadvertent remarks made by the judge must be overruled. These remarks were not strictly upon the facts at issue, and therefore contrary to the inhibition of the constitution. At most they were irrelevant, and as is said in the exceptions, inadvertent. Certainly not so material as to afford ground for a new trial.

The judgment of this court is that the judgment of the Circuit Court be affirmed.

McIVER and McGOWAN, A. J.'s, concurred.