# IN THE SUPREME COURT OF TEXAS

No. 16-0549

DR. BEHZAD NAZARI, D.D.S., ET AL., PETITIONERS,

v.

THE STATE OF TEXAS; XEROX CORPORATION; AND XEROX STATE HEALTHCARE, LLC F/K/A ACS STATE HEALTHCARE, LLC, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued February 6, 2018**

JUSTICE BROWN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE GUZMAN, and JUSTICE DEVINE joined.

JUSTICE LEHRMANN filed an opinion concurring in part and dissenting in part, in which JUSTICE JOHNSON joined.

JUSTICE BOYD and JUSTICE BLACKLOCK did not participate in the decision.

In this enforcement action under the Texas Medicaid Fraud Prevention Act (the Act), the State of Texas alleges that several dentists and their professional associations and employees (collectively, the Providers) fraudulently obtained Medicaid payments for providing dental and orthodontic treatments to children. In response, the Providers assert counterclaims and third-party claims alleging that the state and its contractor mismanaged the payment-approval process and misled the Providers regarding the requirements that the Texas Medicaid Program (the Program)

imposes. The state filed a plea to the jurisdiction against the counterclaims and a motion to dismiss the third-party claims. The trial court granted both. The Providers filed this interlocutory appeal. We conclude that sovereign immunity bars the Providers' counterclaims against the state and that we lack interlocutory jurisdiction to address the trial court's dismissal of the Providers' third-party claims. We affirm the court of appeals' judgment.

# I
## Background

The facts giving rise to this dispute depend on whom you ask. According to the state, the Providers voluntarily agreed to participate in the Program by providing orthodontic treatments to qualifying children in exchange for payments from the state at reduced Medicaid rates.[1] *See generally* 42 U.S.C. §§ 1396 to 1396w–5 (authorizing each state to administer its own Medicaid program); TEX. HUM. RES. CODE § 32.001 (implementing the Texas Medicaid Program "to provide medical assistance on behalf of needy individuals and to enable the state to obtain all benefits for those persons authorized" by federal law). The Program pays for certain "medically necessary" orthodontic treatments, but it does not cover treatments that are for "cosmetic reasons only." 25 TEX. ADMIN. CODE §§ 33.40(b), 33.71(a). As one way of preventing improper payments, the Program requires dentists and orthodontists to obtain prior authorizations for all services and treatments. *Id.* § 33.71(a). During the events that spurred this litigation, Xerox administered the prior-authorization program under a contract with the state. The state alleges that the Providers routinely submitted prior-authorization and post-treatment-payment requests that misrepresented the severity or nature of the patients' conditions, sought payments for services that were never

---

[1] The state's live petition alleges that the Providers fraudulently performed "general dental and/or orthodontic services." The remainder of this opinion refers to these services as "orthodontic services" or "orthodontic treatments."

provided, falsely claimed that licensed employees had provided the services, and in some cases, accepted kickbacks. At the same time, the state alleges, Xerox failed to properly review the Providers' prior-authorization requests and instead simply rubber-stamped them.[2] The state thus maintains that the Providers and Xerox committed independent frauds in violation of the Act, ultimately costing the state "and its taxpayers millions of dollars."

The Providers tell a different story. They deny knowingly submitting false prior-authorization or payment requests. Instead, they claim their requests and services complied with the Program's requirements as the state and Xerox explained and enforced those requirements. According to the Providers, the state permitted and even intended Xerox to approve as many treatments as possible. This instruction, the Providers say, was part of the state's plan to fend off additional liabilities in a series of long-running federal lawsuits related to allegations that the Program "did not satisfy the requirements of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 434 (2004); *see also Frazar v. Ladd*, 457 F.3d 432, 434 (5th Cir. 2006) (discussing "the latest chapter in the suit to improve Texas administration of the Medicaid program to afford health care to the certified class of indigent children").

The Providers allege that because the state was desperate to appear compliant with the federal-court orders, the state turned a blind eye to Xerox's routine rubber-stamping of the Providers' requests. This, the Providers say, led them to believe that the information they were submitting complied with the Program's requirements and established that their patients qualified for orthodontic services. But when reports of the state's exploding expenditures began to emerge,

---

[2] The state's allegations against Xerox form the core of a separate Medicaid-fraud case, also announced today. *See In re Xerox*, ___ S.W.3d ___. (Tex. 2018).

3

the Providers allege the state blamed them in an effort to avoid responsibility for its own actions, enrich itself, and limit its liability to the federal government for having mismanaged the Program. As a result, the Providers say they are not responsible for improper requests, if any, and are not liable for any overpayments. To the contrary, urge the Providers, the state and Xerox are liable for all losses, expenses, and attorney's fees that the Providers have incurred as a result of the state's and Xerox's "scheme."

The state's first step was to initiate administrative actions against various dentists—including the Providers—alleging they fraudulently obtained payments from the Program. An avalanche of legal proceedings involving the state, Xerox, and the Providers ensued. Throughout these proceedings, the state has sought to pursue its claims against Xerox and the Providers separately, while Xerox and the Providers have attempted, unsuccessfully, to join all of the claims in one proceeding. After the administrative-law judges ruled against the state in its administrative actions, the state filed this lawsuit against the Providers.

In this suit, the state alleges that the Providers committed fraud in violation of the Act by submitting false prior-authorization and payment requests, seeking payments for services never rendered, misrepresenting the qualifications of those who provided orthodontic services, and, in some cases, accepting illegal kickbacks. The state argued that the trial court could enjoin the Providers from committing fraud. *See* TEX. HUM. RES. CODE § 36.051(a) (authorizing injunctive relief). It also pleaded in its petition for a recovery "to the maximum extent allowed by law," including specifically:

> (1)    the amount of any payments provided under the [Program], directly or indirectly, as a result of each [Provider's] unlawful acts,
> (2)    prejudgment interest on the amount of the payments or the value of such payments,

4

(3)     two times the amount of any payment provided under the [Program], directly or indirectly, as a result of each [Provider's] unlawful acts,
(4)     civil penalties, and
(5)     expenses, costs, and attorneys' fees.

*See id.* § 36.052 (authorizing civil remedies). The state alleges that each of the Providers is "jointly and severally liable for the damages which arose either directly or indirectly, as a result of each [of the Providers'] unlawful acts."

The Providers filed an answer generally denying the state's allegations. They also asserted counterclaims against the state for conspiracy, breach of contract, and conversion. The Providers seek "proportional recovery of actual and exemplary damages, interest, court costs, and attorney's fees against the State." They allege that the state has waived its sovereign immunity as to the Providers' "connected, germane, and defensive counterclaims" and that it "is liable up to those amounts plead[ed]." The Providers also asserted third-party claims against Xerox, seeking damages and contribution for common-law fraud, breach of contract, promissory estoppel, negligent hiring, negligent supervision, negligence, and gross negligence. They allege the state and Xerox were responsible for authorizing the Providers' services and conspired to rubber-stamp the Providers' authorization and payment requests. The Providers say this conspiracy led them to continue using the same standards to establish medical necessity, making the state and Xerox liable for any payments for services that were not medically necessary.

The state filed a plea to the jurisdiction against the Providers' counterclaims, asserting that sovereign immunity bars the counterclaims and that the Providers lack standing to assert any claims under the Act or for breach of the contract between the state and Xerox. The state also filed a motion to dismiss the Providers' third-party claims against Xerox, arguing that the Act does not permit a defendant to assert third-party claims and that sovereign immunity bars such claims

5

against a state contractor acting within the scope of its contractual authority. The trial court granted both motions, expressly holding that "the state is entitled to bring this action against [the Providers] to the exclusion of other parties." The Providers filed an interlocutory appeal, and Xerox filed a brief supporting the Providers' appeal. The court of appeals affirmed the trial court's order dismissing the Providers' counterclaims. 497 S.W.3d 169, 171 (Tex. App.—Austin 2016). The court did not consider the merits of the Providers' appeal from the order dismissing the third-party claims, concluding that it lacked interlocutory jurisdiction over that order. *See id.* at 184.

We granted the Providers' petition for review. We need not and do not address the merits of the parties' claims or pick between their competing descriptions of the underlying facts. The only issues before us today are: (1) whether sovereign immunity bars the Providers' counterclaims against the state; and (2) whether the trial court erred by dismissing the Providers' third-party claims against Xerox. We conclude that sovereign immunity bars the counterclaims, and we agree with the court of appeals that we lack interlocutory jurisdiction to address the order dismissing the third-party claims.

## II
## Counterclaims

The trial court dismissed the Providers' counterclaims on the ground that sovereign immunity bars those claims, meaning the court lacked jurisdiction to hear them. The common-law doctrine of sovereign immunity prohibits suits against the state unless the state consents and waives its immunity. *See Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017). Sovereign immunity from suit "implicates a court's subject-matter jurisdiction," *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 755 (Tex. 2017), because it recognizes "the courts' limited authority over the sovereign creating them." *Hall*, 508 S.W.3d at 238 (citing *Brown & Gay Eng'g, Inc. v.*

6

*Olivares*, 461 S.W.3d 117, 121 (Tex. 2015)). When it applies, immunity from suit "operates to 'shield the public from the costs and consequences of improvident actions of their governments.'" *Id.* (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006)).

Although the state may elect to waive its sovereign immunity, that policy decision belongs largely to the legislature. *See Engelman*, 514 S.W.3d at 753. The legislature may waive the state's immunity "by statute or by legislative resolution." *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997), *superseded by statute on other grounds as stated in Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). If the legislature elects to waive immunity, it must do so "by clear and unambiguous language." *Tooke,* 197 S.W.3d at 328–29 (citing TEX. GOV'T CODE § 311.034). In this court, the Providers do not argue that the Act expressly waives the state's immunity against their counterclaims, and we agree with the state and the court of appeals that it does not. *See* 497 S.W.3d at 175 ("Nothing in the provisions of the Act can be construed as a waiver of immunity for the claims at issue in this case.").

The Providers argue that the attorney general "waived" the state's sovereign immunity by filing this suit and voluntarily appearing in court. In support, the Providers rely on cases like *Anderson, Clayton & Co. v. State ex rel. Allred,* in which we held that "where a state voluntarily files a suit and submits its rights for judicial determination, it will be bound thereby, and the defense will be entitled to plead and prove all matters properly defensive." 62 S.W.2d 107, 110 (Tex. 1933). "This includes the right," we explained, "to make any defense by answer or cross-complaint germane to the matter in controversy." *Id.* The Providers also cite cases stating, for example, that "[w]hen the state becomes a party to a suit it is subject to the same rules that govern other parties." *Sec. Tr. Co. v. Lipscomb Cty.*, 180 S.W.2d 151, 159 (Tex. 1944); *see also State v.*

*Naylor*, 466 S.W.3d 783, 792 (Tex. 2015) ("[T]he State must abide by the same rules to which private litigants are beholden."); *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 377 (Tex. 2006) ("[T]he City must participate in the litigation process as an ordinary litigant[] . . . ."); *State v. Zanco's Heirs*, 44 S.W. 527, 529 (Tex. Civ. App.—San Antonio 1898, writ ref'd) ("When the state of Texas enters its courts as a litigant, it must be held subject to the same rules that govern other litigants[] . . . .").

The state disagrees, relying on cases like *Borden v. Houston* for the rule that the state's appearance as a plaintiff in its own courts does not waive its immunity against counterclaims. *See* 2 Tex. 594, 611–12 (1847) ("When individuals have rights against the government, the clearest principles of equity and justice demand that those rights shall be respected[] . . . . But however clear the right may be, . . . it can be enforced against the government only by its consent, and in the manner it may prescribe."). And while the state may be bound to follow certain procedures when it appears in court, the state contends, procedural rules cannot waive the state's immunity.

We agree with the state that these decisions do not establish that the state *waives* its sovereign immunity by initiating suit. Many of the cases the Providers cite stand simply for the proposition that procedural rules apply to the state just as they would to any other litigant when the state appears in court. That proposition, though sound, does not answer the question whether sovereign immunity protects the state from having to defend certain actions to begin with. *See Fed. Sign*, 951 S.W.2d at 407 ("To state what happens *if* the State consents to be sued says nothing about whether the State consents to be sued.").

And while the quote from *Anderson* appears to support the Providers' waiver argument, we clarified that case and others like it in *Reata Construction Corp. v. City of Dallas*. *See* 197

8

S.W.3d at 374, 376–77 (citing *Anderson*, 62 S.W.2d at 110). We based our *Reata* holding not on a waiver theory, but on the *scope* of the City's immunity. *See id.* at 375 ("[I]t remains the judiciary's responsibility to . . . determine under what circumstances sovereign immunity exists in the first instance."). So although we defer to the legislature to determine whether the state has waived immunity, "sovereign immunity is a common-law creation," and the "responsibility to define the boundaries of the doctrine" remains with the judiciary. *Engelman*, 514 S.W.3d at 753. One such boundary is that a governmental entity simply "does not have immunity from suit for monetary claims against it that are 'germane to, connected with, and properly defensive to' affirmative claims made by the entity," to the extent that the claims against the entity offset the entity's own claims. *City of Dallas v. Albert*, 354 S.W.3d 368, 372 (Tex. 2011) (quoting *Reata*, 197 S.W.3d at 378). "This is not because the governmental entity 'waives' its immunity by filing a claim for affirmative relief. Instead, the scope of governmental immunity simply does not reach the defensive counterclaims to the extent that any recovery on the counterclaims serves as an 'offset' against the government's recovery." *C. Borunda Holdings, Inc. v. Lake Proctor Irrigation Auth. of Comanche Cty.*, 540 S.W.3d 548, 550 (Tex. 2018) (per curiam) (citations omitted).

At issue here, then, is not whether the state waived its immunity against the Providers' counterclaims by filing this suit, but whether the scope of the state's immunity encompasses those counterclaims to begin with. *See Albert*, 354 S.W.3d at 375. We agree with the parties that the principles we announced in *Reata* govern the resolution of that issue. We explained in *Reata* that once a "governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for *monetary damages*, the entity will presumably have made a decision to expend resources to pay litigation costs." 197 S.W.3d at 375 (emphasis added). We also

9

recognized that "it would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it." *Id.* at 375–76.

To resolve the issue, we must first answer which part of the phrase "monetary damages" best captures *Reata*'s holding: is it the word "monetary," as the Providers argue, or is it the word "damages," as the state argues? *See id.* at 375. We conclude that *Reata* applies to damages, but that the question whether it applies further—and how much—is one of first impression. This conclusion gives rise to a second question: does *Reata* apply to penalties? We conclude that it does not. The third question is whether the state's action under the Act seeks to impose a penalty. We answer that question in *Xerox*, also decided today. *See Xerox*, ___ S.W.3d at ___. In that case, "[c]onstruing the statute as a whole, we conclude Section 36.052 of the [Act] employs a penalty scheme." *Id.* at ___. Since the Act is penal, *Reata*'s abrogation-of-immunity rule does not apply. Accordingly, the state's sovereign immunity protects it from the Providers' counterclaims.

**A**

The Providers argue that *Reata* applies broadly: anytime the state seeks a transfer of funds. They contend that we have given "broad application" to the rule waiving sovereign immunity when the state files a suit "in the form of affirmative claims for monetary relief." Thus, the Providers argue, "*Reata* simply does not contemplate or support a distinction between damages and penalties" and "the [court of appeals] was wrong to create one." The Act authorizes (and the state has pleaded for) a monetary award including: (1) the amount of any payment the state made as a result of each unlawful act, (2) prejudgment interest on that amount, (3) a civil penalty for each unlawful act, and (4) two times the amount of any payment made as a result of an unlawful

10

act. *See* TEX. HUM. RES. CODE § 36.052(a). The Providers argue that although *Reata* happened to involve tort claims for compensatory damages, we did not limit our holding to *only* those types of claims seeking *only* that type of monetary relief. *See, e.g.*, 197 S.W.3d at 376–78 (referring three times to the governmental entity's claims for "monetary relief"); *id.* at 377 ("Once it asserts affirmative claims for *monetary recovery*, the City must participate in the litigation process as an ordinary litigant[] . . . ." (emphasis added)); *id.* at 375 ("If the opposing party's claims can operate only as an offset to reduce the *government's recovery*, no tax resources will be called upon to pay a judgment[] . . . ." (emphasis added)).

The state responds that *Reata* applies narrowly: only when the state seeks compensatory damages. Since *Reata* referred to the City's claim as "damages," the state says that damages are the only type of relief that *Reata* addressed. *See id.* at 377 ("[The City's decision] to file suit for *damages* encompassed a decision to leave its sphere of immunity from suit for claims against it which are germane to, connected with and properly defensive to claims the City asserts." (emphasis added)); *id.* ("[T]he trial court acquired subject-matter jurisdiction over claims made against the City which were connected to, germane to, and properly defensive to the matters on which the City based its claim for *damages*." (emphasis added)); *id.* ("[T]he trial court did not acquire jurisdiction over a claim for *damages* against the City in excess of *damages* sufficient to offset the City's recovery, if any." (emphasis added)); *id.* ("[T]he City's assertion of claims for *damages* against Reata means that the City does not have immunity from Reata's claims to the limited extent we have explained . . . ." (emphasis added)).

We do not agree with either party's characterization of our precedent. In *Reata* and its progeny, we used broad terms like "monetary relief" simply to refer to the damages the

11

government sought. That usage does not establish that *Reata* applies to all money claims, as the Providers suggest. But neither does it expressly limit the *Reata* rule to compensatory damages, as the state suggests. In other words, the issue whether the *Reata* rule covers the facts this case presents is one of first impression.

1. **Pre-*Reata* decisions**

*Reata*'s abrogation analysis cites eight cases, but it discusses only three of them in depth. *See* 197 S.W.3d at 376–77. Two cases appear only once each. *See id.* (first citing *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 861 (Tex. 2002) (Hecht, J., concurring)); and then citing *City of La Porte v. Barfield*, 898 S.W.2d 288, 297 (Tex. 1995), *superseded by statute as stated in Manbeck v. Austin Indep. Sch. Dist.*, 381 S.W.3d 528, 532 (Tex. 2012) (per curiam)). Three more cases appear only in footnotes. *See id.* 376–77 nn.2–3. (first citing *Borden*, 2 Tex. at 611; then citing *Bates v. Republic of Texas*, 2 Tex. 616, 618 (1847); and then citing *Sw. Contract Purchase Corp. v. McGee*, 36 S.W.2d 978, 979 (Tex. 1931)). The remaining cases are the three on which *Reata*'s analysis most relied. *See id.* (first discussing *Anderson*, 62 S.W.2d 107; then citing *State v. Humble Oil & Ref. Co.*, 169 S.W.2d 707 (Tex. 1943); and then citing *Kinnear v. Tex. Comm'n on Human Rights ex rel. Hale*, 14 S.W.3d 299 (Tex. 2000) (per curiam). None of these cases support the view that *Reata* contemplated abrogating immunity anytime the state sues in its own courts to obtain money.

The first of the three principal cases on which *Reata* relied, *Anderson*, was an enforcement action in which the state sought "recovery of penalties" against a trucking company that was operating without a license. *Anderson*, 62 S.W.2d at 107. Importantly, although the state was seeking a penalty, the counterclaimants in *Anderson* "alleged that the agents of the state were

acting unlawfully and in excess of their authority" and "sought an order enjoining such officers from interfering with the operating of the trucks over the highways." *Id.* at 109. That is, the counterclaimants were not seeking monetary relief. *See id.* We held that they could maintain their counterclaim against the state in that case, reasoning that

> The state having invoked the jurisdiction of the district court . . . for a judicial determination of the question as to whether the defendants were . . . liable for the penalties . . . became subject to the same rules as other litigants, except in so far as such rules may be modified in favor of the state by statute or may be inapplicable or unenforceable because of exemptions inherent in sovereignty.

*Id.* at 110. We concluded that a "state's immunity from suit does not extend to a suit against state officers to enjoin the enforcement of an invalid law." *Id.* We also noted the "further rule" that "where a state voluntarily files a suit and submits its rights for judicial determination, it will be bound thereby, and the defense will be entitled to plead and prove all matters properly defensive." *Id.* Since the counterclaimants in *Anderson* did not even seek any money from the state, that case—although it has figured prominently in subsequent claims for money—establishes little in determining which of the state's suits for money *Reata*'s abrogation rule applies to. If anything, *Anderson*'s reference to the "exemptions inherent in sovereignty" indicates that counterclaims for money are different from counterclaims for injunctive relief. *Id.*

The second case, *State v. Humble Oil & Refining Co.*, involved an operator that overpaid taxes in some months but underpaid them in another. *See* 169 S.W.2d at 708. When the state tried to recover the underpayments, the operator, relying on "the general rule announced in *Anderson*[,]" claimed the overpayments as an offset, and it paid the difference rather than the full tax it owed for the underpaid month. *See id.* at 709 (citing *Anderson*, 62 S.W.2d at 110). We rejected the operator's argument:

13

> We have no fault to find with the rule of law announced in the *Anderson, Clayton & Co.* opinion, when applied in a proper case. *It, however, can have no application in this suit, because to here apply it would allow it to abolish the rule that taxes due the State cannot be offset by an indebtedness due by the State to the tax debtor.* Furthermore, here we have no offset claim which is dependent upon, connected with, or grew out of the subject matter of this suit. It is true that the subject matter of this suit is gross production taxes on oil, and the subject matter of the offset claim is the same character of taxes. But the one claim has no connection with the other, and the two claims are entirely independent of each other. . . . The two claims are not even involved in the same report.

*Id.* 709–10 (emphasis added). *Humble Oil* thus recognized something that *Anderson* itself did not—that the "rule of law announced" in *Anderson* could apply to some monetary offsets. *Id.* at 709; *see also Anderson*, 62 S.W.2d at 110 (allowing a counterclaim for injunctive relief). If the rule were otherwise, the *Humble Oil* court would have had no reason to exempt taxes from *Anderson*'s ambit. Accordingly, one of the first cases recognizing that the *Anderson* rule could apply to money also recognized that the rule did not apply to *all* money. As such, *Humble Oil*, though it predates *Reata*, directly contradicts the proposition that the *Reata* rule applies to all monetary offsets. *See Humble Oil*, 169 S.W.2d at 709–10; *see also Reata*, 197 S.W.3d at 371 (noting approvingly that *Humble Oil* "acknowledged that in *certain circumstances*, a defendant would be entitled to assert a claim against the State" (emphasis added)).

The third case, *Kinnear v. Texas Commission on Human Rights ex rel. Hale*, addressed a counterclaim for attorney's fees in response to the state's initiation of a suit under the Texas Fair Housing Act. *See* 14 S.W.3d at 300. We held that "the jurisdictional question [of immunity from suit] . . . was answered when the Commission filed suit." *Id.* Because the state had waived immunity from liability by failing to plead it, we "render[ed] judgment awarding Kinnear his attorney fees and costs" under the Fair Housing Act. *Id.* The state's allegation brought with it a claim for monetary relief, *see* TEX. PROP. CODE § 301.153, but a jury found against the state, and

14

we awarded Kinnear attorney's fees on that basis, *see* 14 S.W.3d at 300. In other words, the attorney's fees in *Kinnear* were not an offset. Thus, *Kinnear* had no reason to cite (and did not cite) *Anderson* or *Humble Oil*. So while *Kinnear* involved an abrogation of immunity, it was not the type of abrogation we announced in *Anderson* and expounded on in *Reata*. As a result, it provides scant reason to conclude anything about *Reata*'s scope.

In sum, of the three cases on which *Reata* grounded its analysis, the first did not even involve a counterclaim for money, *see Anderson*, 62 S.W.2d at 110, the second dealt primarily with sovereign immunity *barring* a counterclaim for money in the tax context, *see Humble Oil*, 169 S.W.2d at 709–10, and the third *allowed* attorney's fees against the state in response to a failed enforcement action that did not even involve an offset, *see Kinnear*, 14 S.W.3d at 300. Against this backdrop, the Providers ask us to conclude that *Reata* applies "without regard to the type of monetary relief" sought.

### 2. *Reata*

In *Reata*, a contractor sued a subcontractor, alleging that the subcontractor negligently drilled into a water main. *See* 197 S.W.3d at 373. The subcontractor filed a third-party claim against the City of Dallas. *See id*. Before answering the subcontractor's third-party claim, the City intervened and "assert[ed] claims of negligence against [the subcontractor] *and* a plea to the jurisdiction asserting governmental immunity from suit." *Id.* (emphasis added). That is, the City sought to recover for the subcontractor's negligence, and at the same time maintained that it was immune from answering for its own negligence. *See id.* We announced, in *Reata*'s introductory paragraph, that "the City does not have immunity from suit as to [the subcontractor's] claims which are germane to, connected with, and properly defensive to the City's claims, to the extent [the

15

subcontractor's] claims offset those asserted by the City." *Id.* The remainder of the opinion confirms that our decision regarding the City's claims resulted from the claims' character as *damages* rather than their character as *money*. *See generally id.* at 374–77.

First, *Reata* uses the word "damages" more than a dozen times. By contrast, it refers but three times to the City's "recovery," twice to its claims for "monetary relief," and only once to a "monetary recovery." *See id.* at 373–78. This usage indicates that we decided the case based on the narrow theory of damages rather than the broad theory of a transfer of funds. *See id.* at 375 ("The United States Supreme Court has also recognized that suits for money *damages* against states 'may threaten the financial integrity of the States' and that 'at the time of the founding, many of the States could have been forced into insolvency but for their immunity from private suits for *money damages*.'" (emphasis added) (quoting *Alden v. Maine*, 527 U.S. 706, 750 (1999)). Our purpose in using the broader phrase was benign: avoiding repetition. And to the extent we used "monetary relief" and its variants as something other than synonyms for "damages," our goal was to emphasize "*monetary* relief" as opposed to *injunctive* and other types of relief rather than to abrogate the state's sovereign immunity every time it enters a court in pursuit of a money judgment. *See id.* at 376–77; s*ee also Hilco Elec. Co-op., Inc. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex. 2003) (applying the rule that "when words of a general nature are used in connection with the designation of particular objects or classes . . . the meaning of the general words will be restricted to the particular designation").

Second, accepting the interpretation the Providers urge—that *Reata* applies "without regard to the type of monetary relief" sought—would require us to accept that *Reata* overruled *Humble Oil* sub silentio. Because if the *Reata* rule applies to every "monetary recovery," *see* 197

S.W.3d at 377, then the *Reata* rule applies anytime the state sues to collect taxes. But *Humble Oil* holds precisely the opposite. *See* 169 S.W.2d at 710 ("[T]axes due [to] the State cannot be offset by an indebtedness due by the State to the tax debtor."). Moreover, *Reata* relied heavily on *Humble Oil* as one of "our decisions that . . . in effect, modified the common-law immunity doctrine and, to an extent, abrogated immunity of the entity that filed suit." *See* 197 S.W.3d at 377 (first citing *Humble Oil* 169 S.W.2d at 710; and then citing *Anderson*, 62 S.W.2d at 110). Had we intended to overrule *Humble Oil*, we would have done so directly, and we certainly would not have relied on it as one of the three foundational cases supporting the rule we announced. This suggests that the rule we adopted in *Reata* applies to something less than the full spectrum of legal actions the state has at its disposal for effecting a monetary transfer.

Third, if *Reata* abrogated immunity for some class of cases beyond damages, why is "monetary recovery" the limit rather than "recovery" in general or simply "any claim"—monetary or otherwise? *See, e.g.*, 197 S.W.3d at 375–76 ("In this situation, we believe it would be fundamentally unfair to allow a governmental entity to assert *affirmative claims* against a party while claiming it had immunity as to the party's *claims* against it." (emphasis added)); *id.* at 376 ("[W]hen an *affirmative claim for relief* is filed by a governmental entity, subsequent cases indicate that under such circumstances immunity from suit no longer completely exists for the governmental entity." (emphasis added)). Since the Providers' interpretation offers no upper limit on *Reata*'s ambit, we decline to adopt it. Though subsequent cases may modify, expand, or clarify its scope, in *Reata* itself the abrogation-of-immunity rule applied only to the City's claim for damages.

17

Moreover, our decisions following *Reata* also support the conclusion that the *Reata* rule applies to some, though not necessarily all, monetary claims. For example, in *City of Dallas v. Albert*, we characterized our decision in *Reata* as one "conclud[ing] that immunity from suit was abrogated to a *limited* degree." 354 S.W.3d at 379 (emphasis added) (citing *Reata*, 197 S.W.3d at 375–76); *see also Reata*, 197 S.W.3d at 377 ("[T]he City does not have immunity from Reata's claims to the *limited* extent we have explained . . . ." (emphasis added)). Similarly, in *City of Galveston v. State*, just one year after *Reata* and *Tooke v. City of Mexia*, we noted that "we recently held in *Reata* . . . that immunity does not exist when a government affirmatively files suit for *money damages*." *City of Galveston v. State* 217 S.W.3d 466, 471 (Tex. 2007) (emphasis added); *see also Manbeck*, 381 S.W.3d at 532 ("In *Reata*[,] . . . we held that when a governmental entity asserts an affirmative claim for *monetary damages* against its opponent, [the *Reata* rule applies]." (emphasis added)).

These considerations convince us that the state's assertion of a claim for monetary relief, standing by itself, is not enough to trigger *Reata*'s abrogation-of-immunity rule. Said otherwise, the fact that the state seeks a transfer of funds is not *sufficient* to place it beyond the protections that immunity from suit affords. When it asserts an affirmative claim for damages, the state steps outside the sphere of its immunity from suit to the extent we described in *Reata. See* 197 S.W.3d at 375–76. But money is at issue in many more of the state's actions than those in which it seeks damages.

**B**

Having concluded that the *Reata* rule does not abrogate sovereign immunity in every suit in which the state seeks a transfer of funds, we must next consider whether the *Reata* rule applies

18

to the action at issue in this case. Contrary to the Providers' argument, we have never held that the *Reata* rule *always* applies when the government seeks any transfer of funds. And contrary to the state's suggestion, nor have we ever held that *Reata* applies *only* to compensatory damages. We hold neither today. Instead, we hold that the *Reata* rule—under which the state, by participating in certain litigation, steps outside the sphere of protection that common-law immunity from suit provides—*never* applies when the state initiates litigation to enforce a substantive prohibition against unlawful conduct by imposing a monetary penalty. Sovereign immunity protects the state from counterclaims that seek to offset a penalty. Several strands in our jurisprudence support this rule.

First, "offsets" are never "germane to, connected with, and properly defensive to" whether a monetary penalty is due. *See Reata*, 197 S.W.3d at 377. Penalties are inherently one-sided. Citizens cannot claim a penalty against the state, but the state can and does frequently assess fines, penalties, and sanctions against its citizens. Accordingly, a citizen seeking to offset a penalty must assert some other, non-penal source of the state's liability—a tort, a contract, etc. But in that situation, "one claim has no connection with the other, and the two claims are entirely independent of each other." *See Humble Oil*, 169 S.W.2d at 710. Indeed, *Humble Oil* holds that taxes from one month are not "dependent upon[ or] connected with" taxes from another. *Id.* The same is true for penalties. When the state seeks to sanction primary conduct, a properly defensive response is that the conduct never occurred, or that it occurred to some lesser degree than the state alleges—not that the state cannot collect the penalty because the state itself owes some other, non-penal sum.

In their conspiracy and breach-of-contract counterclaims, the Providers contend, essentially, that they should not be liable for their fraud because the state let them get away with

it. This argument has nothing to do with whether the Providers violated the Act. They may have strong arguments that they did not, though we express no opinion on that point. Even under *Albert*'s description of *Reata*'s connectedness prong—that a counterclaim is "germane" if it is "relevant to" or "would at least inferentially rebut" the state's claim—the Providers' counterclaims have not connection with whether they violated the Act. *See Albert*, 354 S.W.3d at 375–77 (discussing *Reata*, 197 S.W.3d at 377).

Similarly, the Providers' conversion counterclaim cannot meet *Reata*'s requirements. The Providers argue that the state has converted funds by holding money that is earmarked for services "for which [the Providers] should be paid." The problem with this argument is that whether the Providers "should be paid" is already one of the central issues in this case. That is, the conversion counterclaim is unavailable under *Reata* because it could never meet *Reata*'s other predicate—offset. *See* 197 S.W.3d at 378. A merits victory for the state would vindicate the state's current payment hold. The held payments would stay with the state, so they could not function as an offset for the Providers. By contrast, a merits victory for the Providers would earn them the held payments. But a win for the Providers would mean that the Providers owe no penalties and so have no judgment to offset. Nor can *Reata* answer whether the Providers *presently* deserve to possess the funds while this litigation unfolds. Offset is a requirement under *Reata*, *see id.*, and there will be nothing for the held funds to offset until this litigation concludes in the state's favor (if it does so conclude), at which point the temporary payment hold will no longer be relevant. The state's victory would eliminate the *Reata* hurdle, but it would also conclusively destroy the conversion counterclaim's basis. So regardless of whether the Providers seek a permanent determination that

they "should be paid" or a temporary determination that they "should possess the payments" while this suit is ongoing, *Reata* does not help them.

Second, safeguarding the treasury is one of sovereign immunity's primary justifications in the modern era. *See, e.g.*, *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) (per curiam) ("[T]he doctrine of sovereign immunity originated to protect the public fisc from unforeseen expenditures that could hamper governmental functions . . . ."); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 375 (Tex. 2009) ("Th[e] compromise between prospective and retroactive relief[] . . . . comports with the modern justification for immunity: protecting the public fisc."); *Tooke*, 197 S.W.3d at 332 (sovereign immunity "shield[s] the public from the costs and consequences of improvident actions of their governments"); *IT-Davy*, 74 S.W.3d at 854 ("Subjecting the government to liability may hamper governmental functions by shifting tax resources away from their intended purposes toward defending lawsuits and paying judgments.").

Many state programs and offices—including Medicaid, police departments, environmental agencies, etc.—depend at least in part for their continued existence on collecting revenue in the form of penalties. Hampering these entities' collections by abrogating their sovereign immunity injures the public fisc just as surely as allowing private citizens to sue them directly for damages. For example, under the Providers' view of *Reata*, any driver could assert a "selective enforcement" counterclaim to any speeding ticket. The driver could argue, as the Providers do here, that he thought his conduct was permissible because it went unpunished for several years. The driver might even argue that the police department and, for example, a toll-road operator, conspired to trick the driver into speeding as part of a scheme to boost tolls. Of course, such arguments would not be relevant to whether the offensive conduct actually occurred. But they would, if sovereign

21

immunity did not protect governmental entities from their assertion, dramatically reduce entities' ability to collect revenue. That is why, in an analogous case, we recognized "the rule that taxes due [to] the State cannot be offset by an indebtedness due by the State to the tax debtor." *Humble Oil*, 169 S.W.2d at 710.

Third, sovereignty itself remains an important justification for sovereign immunity. *See Hosner v. DeYoung*, 1 Tex. 764, 769 (1847) ("[M]andamus is not a process that can be resorted to against the state without its consent, and . . . no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent."); *see also Fed. Sign*, 951 S.W.2d at 411 ("The State's immunity to suit is, purely as a matter of sovereignty, impervious to due process concerns."); *Herring v. Houston Nat'l Exch. Bank*, 269 S.W. 1031, 1032 (Tex. 1925) ("[Immunity] is an attribute of sovereignty[] . . . ."). Penalties serve a law-enforcement function and the indiscriminate assertion of spurious counterclaims would severely undermine their effectiveness. Because such counterclaims would interfere with the state's ability to enforce its laws, we decline to abrogate the sovereign immunity that protects the state from their assertion.

A penalty cannot be offset against the state any more than a prison sentence. Because applying the *Reata* rule to penalties would run counter to *Reata* itself and would thwart the primary justifications underlying sovereign immunity's very existence, we conclude that the rule never applies to offset a penalty.

## C

The Providers argue that even if *Reata* does not apply to penalties—or even if it applies only to damages—it applies in this case because the state is seeking damages, at least in part. The state responds that this proceeding is a "law-enforcement action" in which the state is seeking

statutory "sanctions" or "penalties," or perhaps "liquidated damages" (as opposed to compensatory damages). Although some of the Act's penalties must be calculated with reference to the underlying fraud's monetary amount, *see Xerox*, ___ S.W.3d at ___, the state argues that the legislature is free to choose whatever measure of penalty it sees fit. That is, the state argues that the legislature can penalize for monetary losses just as it can for other infractions. The court of appeals agreed with the state, concluding that "the civil penalties that the state is seeking against the [Providers] do not qualify as *damages* or *monetary relief* as those terms were used in *Reata.*" 497 S.W.3d at 181. Instead, that court said, the state sued for a civil penalty to "punish" the Providers for violating a public-welfare statute and to deter others from doing the same. *Id.* at 179.

Our decision in *In re Xerox*, also announced today, conclusively rebuts the Providers' argument. *See* ___ S.W.3d at ___. We begin the relevant analysis with the observations that "Medicaid fraud exacts an immense toll from the system, not all of which is discoverable, recoverable, or quantifiable as damages" and that "[t]he civil remedy in Section 36.052(a) is undeniably punitive in the aggregate." *See id.* at ___. We also examine the amounts that the Act imposes in subsections 36.052(a)(1), (2), (3), and (4), in each instance observing that the amount is penal rather than compensatory. *See id.* at ___. Finally, we conclude that "Section 36.052 of the [Act] employs a penalty scheme and is not an 'action for the recovery of damages' to which [Texas Civil Practice and Remedies Code] Chapter 33's proportionate-responsibility mandate applies." *Id.* at ___.

Section 36.052 is penal for purposes of chapter 33 because the Act "employs a penalty scheme." *See id.* at ___. Our damages discussion in *Xerox* turns on the Act, not on chapter 33. *See id.* at ___. As a result, section 36.052 is penal for purposes of the chapter 33 analysis in *Xerox* as

well as for the *Reata* analysis in this case. It would make little sense for the word "damages" to mean one thing in the proportionate-liability context and another in the sovereign-immunity context. And since *Xerox* depends on the Act rather than on some other statute, our conclusion in that case governs the outcome in this one. *See id.* at ___.

*Reata*'s abrogation-of-immunity rule does not apply when the state seeks to impose a monetary penalty to enforce a substantive prohibition against unlawful conduct. Since the state's action is punitive rather than compensatory, *see id.* at ___, the *Reata* rule does not apply here. Accordingly, we need not address the state's contentions that it is not suing as an ordinary litigant or that the Providers' counterclaims fail *Reata*'s "connectedness" prong. Because it is neither waived nor abrogated, sovereign immunity bars the Providers from asserting their counterclaims against the state.

## III
## Third-Party Claims

Finally, the Providers also complain that the trial court erred by dismissing their third-party claims against Xerox. The court of appeals refused to address this complaint, concluding that it lacked jurisdiction to consider the issue on interlocutory appeal. *See* 497 S.W.3d at 182–84. We agree with the court of appeals. The trial court's order dismissing the third-party claim was an interlocutory order, and "[a] party may not appeal an interlocutory order unless authorized by statute." *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 352 (Tex. 2001). The legislature has authorized interlocutory appeals from an order granting or denying a governmental unit's challenge to the trial court's jurisdiction. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8). But the state moved to dismiss the Providers' third-party claims against Xerox on the ground that the Act does not permit third-party claims.

Texas statutes do not authorize an interlocutory appeal from an order granting a governmental unit's motion to dismiss third-party claims on non-jurisdictional grounds. We do not address the merits of the Providers' third-party claims or whether those claims are permissible in this action. We simply agree with the court of appeals that we lack interlocutory jurisdiction to address those issues.

\* \* \*

In 1847, this Court decided a trio of cases recognizing the fundamental principle that "[c]oercion . . . is incompatible with sovereignty." *Borden*, 2 Tex. at 611; *see also Hosner*, 1 Tex. at 769; *Bates*, 2 Tex. at 617–18. Then, as now, we acknowledged that "[t]here may have occurred in the opinions some unguarded expressions in relation to the equitable rights of the defendants, and powers of the courts, on the subject of set-off against the government." *Bates*, 2 Tex. at 617. And then, as now, we were vigilant to prevent artful advocacy from reducing sovereign immunity to a nullity. There are some monetary actions for which no monetary setoff can be available. Penalties are among them. Accordingly, we affirm the court of appeals' judgment.

_____
Jeffrey V. Brown
Justice

**OPINION DELIVERED**: June 22, 2018

25